UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

LASALLE STAFFING, LLC,                )
                                      )
            Plaintiff,                )
                                      )    Case No. 1:26-cv-7876
      v.                              )
                                      )
ADAM SCHAUFELBERGER and BEACON        )
HILL SOLUTIONS GROUP, LLC,            )
                                      )
            Defendants.               )

## VERIFIED COMPLAINT

Now comes Plaintiff, LaSalle Staffing, LLC ("LaSalle"), by and through its undersigned counsel, and files this Verified Complaint against Defendants Adam Schaufelberger ("Schaufelberger") and Beacon Hill Solutions Group, LLC ("Beacon Hill") (collectively, "Defendants"), alleging as follows:

## NATURE OF THE CASE

1.      LaSalle is a staffing company located in Chicago, Illinois that provides staffing services to clients in multiple states.

2.      As a staffing company, LaSalle's success and ability to compete in the marketplace depend on developing and maintaining a confidential network of clients and candidates. LaSalle invests significant money and resources to attract, obtain, and retain those clients and candidates.

3.      To develop and maintain its relationships with these clients and candidates, and to obtain new clients and candidates, LaSalle depends on employees in whom LaSalle has invested significant money and resources, and to whom LaSalle has provided access to its confidential, proprietary, and trade secret information.

288540190.v5

4.     This action arises from the unlawful post-employment conduct of LaSalle's former employee, Schaufelberger, and his new employer, Beacon Hill.

5.     LaSalle hired Schaufelberger as an Account Executive on or about April 5, 2021. In connection with his employment, Schaufelberger entered into an Employment Agreement dated March 26, 2021, effective as of April 5, 2021 (the "Employment Agreement").

6.     The Employment Agreement contains restrictive covenants, including covenants restricting competition, solicitation of LaSalle's clients and candidates, interference with LaSalle's business relationships, and misuse or disclosure of LaSalle's confidential information.

7.     As consideration for his entry into the Employment Agreement, Schaufelberger received continuous, at-will employment with LaSalle for more than four years and a sign-on bonus of $500.00.

8.     During his employment with LaSalle, Schaufelberger was promoted from Account Executive to Account Executive II in or around February 2022. Thereafter, in or around September 2022, Schaufelberger was promoted to Business Development Manager, a title he retained until he voluntarily resigned from his employment with LaSalle on or about September 8, 2025.

9.     Schaufelberger thereafter began working for Beacon Hill, a direct competitor of LaSalle, as a Senior Account Executive.

10.    In his role with Beacon Hill, Schaufelberger represents Beacon Hill's staffing division, building client relationships and providing staffing solutions to businesses seeking administrative and professional talent. In this role, Schaufelberger performs essentially the same work that he performed while employed by LaSalle.

11.     Schaufelberger's employment with Beacon Hill violates the non-competition and non-solicitation obligations that Schaufelberger owes to LaSalle pursuant to the Employment Agreement.

12.     On or about June 17, 2026, LaSalle discovered that Schaufelberger was actively communicating with a longstanding business client of LaSalle.   On that date, the business client sent an email chain to Schaufelberger's former LaSalle email address.  The email chain indicated that Beacon Hill was soliciting the business of LaSalle's client and that Schaufelberger had been meeting with the client monthly.

13.     Schaufelberger acquired the client contact and relationship exclusively through his work with LaSalle. Schaufelberger would not have had such contact or relationship without the particularized training, resources, client relationship development, and confidential information he received at LaSalle's expense.

14.     As a Business Development Manager for LaSalle, Schaufelberger's job performance hinged upon growing, maintaining, and utilizing LaSalle's confidential network of clients and candidates.  Given the analogous nature of Schaufelberger's position with Beacon Hill and Schaufelberger's ongoing correspondence with LaSalle's business client, Schaufelberger has misappropriated LaSalle's confidential information and trade secrets and intends to use or has used such confidential information and trade secrets to perform his new role, for the benefit of himself and Beacon Hill and to the detriment of LaSalle.

15.     Defendants' conduct has caused, and will continue to cause, irreparable harm to LaSalle, including harm to client goodwill and business relationships, loss of confidential and proprietary information, loss of competitive position, and monetary damages.

3

288540190.v5

16. LaSalle seeks immediate, preliminary, and permanent injunctive relief, including a temporary restraining order, to enforce Schaufelberger's restrictive covenants, prevent Defendants from soliciting or accepting business from LaSalle clients and candidates in violation of the Employment Agreement, prevent Defendants from using or disclosing Lasalle's confidential, proprietary, and trade secret information, require preservation and return of LaSalle property, and permit expedited discovery sufficient to determine the full scope of Defendants' conduct, including whether Schaufelberger retained, transferred, or used LaSalle information after his resignation.

17. Given Defendants' unlawful conduct, LaSalle brings this action under the Federal Defend Trade Secrets Act ("DTSA") and applicable state law, including the Illinois Trade Secrets Act ("ITSA") and common law theories of breach of contract, tortious interference with contract, and civil conspiracy.

## THE PARTIES

18. LaSalle is a limited liability company organized under the laws of the State of Delaware that is registered to do and conducts business in the State of Illinois, at 200 North LaSalle Street, Suite #2500, Chicago, Illinois 60601.

19. Schaufelberger is a former employee of LaSalle and a resident of Cook County, Illinois. Schaufelberger may be served with process at his residence which is located at 341 N. Brainard Avenue, La Grange Park, Illinois 60526.

20. At all relevant times, Schaufelberger conducted business within this judicial district and the acts or omissions of Schaufelberger occurred or had their effects, in whole or in part, in this judicial district.

21. Beacon Hill is a limited liability company organized under the laws of the State of Massachusetts that conducts business in the State of Illinois. Beacon Hill may be served with

4

288540190.v5

process through its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261.

22.     Like LaSalle, Beacon Hill is a staffing company that provides both temporary contract staffing and direct hire recruiting services in the Chicago, Illinois area.  Accordingly, Beacon Hill is a direct competitor of LaSalle.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and applicable law, as this is a civil action arising under the laws of the United States for injunctive relief and damages as a result of Defendants' violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.

24.     This Court has supplemental jurisdiction over LaSalle's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because the events or omissions giving rise to the claims asserted herein occurred in this judicial district and a substantial part of the property that is the subject of this action is situated in this judicial district.

26.     Further, Schaufelberger agreed as part of the Employment Agreement that the federal and state courts located in Cook County, Illinois were the "sole proper venue and jurisdiction for any disputes" arising under that Agreement.  (Employment Agreement § 15(A)). A copy of the Employment Agreement is attached hereto as **Exhibit A**.

288540190.v5

**FACTUAL BACKGROUND**

### I. LaSalle's Business.

27.     LaSalle is a staffing agency that assists clients with identifying and selecting optimal candidates for vacant positions and/or providing its clients with workers to perform services on a project or temporary basis. LaSalle provides staffing services in multiple states and for clients with hiring and staffing needs that may extend across state lines. Currently, LaSalle provides services in Arkansas, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Washington D.C., and Wisconsin.

28.     Given the nature of its business, the locations in which LaSalle provides services to clients and candidates fluctuate. On any given day, LaSalle may do business with a candidate or client who is located in a different state, including a state in which LaSalle is not currently active.

29.     The temporary staffing services that LaSalle performs involve sourcing and providing clients with qualified professionals to satisfy a short-term need or long-term project for that business. Clients entering into a temporary staffing contract with LaSalle typically pay LaSalle an hourly fee for the temporary use of these professionals.

30.     The direct hire search services that LaSalle provides involve sourcing job candidates for those clients with job vacancies.  If selected, the candidate becomes an employee

6

288540190.v5

of the client. LaSalle receives a percentage of the candidate's initial base salary as compensation for a successful direct search.

31. The positions for which LaSalle is engaged to provide staffing services include administrative and professional positions at all levels of seniority.

32. In the staffing field, an extensive and confidential network of clients and candidates is necessary for survival and growth.

33. It generally takes LaSalle three to six months to secure business from a client, which requires extensive sales efforts. These sales efforts include, without limitation, identification and research of target companies; outreach attempts and relationship-building conversations; introductory meetings and discovery calls; additional discussions pertaining to hiring needs, compensation benchmarks, and service models; negotiation of contractual terms and vendor onboarding requirements; and internal coordination between sales leadership and recruiting teams.

34. In addition to time, there are several direct and indirect costs associated with securing a new client, including the cost to attend networking events and industry conferences, salaries and commissions for business development staff, and costs related to recruiting systems and technology.

35. LaSalle estimates that the cost to acquire a new client relationship can exceed thousands of dollars before a placement is ever made, and in many cases, can cost significantly more depending on the duration and complexity of the sales cycle.

36. Given this significant investment, LaSalle prioritizes maintaining client relationships.

288540190.v5

37. LaSalle expends a significant amount of money each year to retain clients. Such costs include Per Client Acquisition ("PCA") costs, recruiting infrastructure costs, and costs incurred in securing experienced and well-trained recruiters.

38. LaSalle's efforts are highly successful. The majority of LaSalle's clients are long-term clients, and approximately 93 percent of LaSalle's clients have been clients for more than a year. To retain clients, LaSalle's sales representatives and recruitment professionals must continue to be in contact with clients and to build goodwill on behalf of LaSalle.

39. The culmination of these efforts costs LaSalle hundreds of thousands of dollars annually in personnel, technology, and resource costs to develop and maintain client relationships. Specifically, with respect to PCA, LaSalle incurs for each client personnel costs that total approximately $5,000.00 to $7,500.00, technology costs that total approximately $1,000.00 to $2,000.00, and marketing and business development costs that total approximately $1,000.00 to $2,000.00.

40. Further, experienced and well-trained business development and recruitment professionals are critical to LaSalle's success in acquiring and retaining its clients.

41. LaSalle invests similarly in its efforts to attract, recruit, and assign or place job-seeking candidates. LaSalle employs a recruiting team to source candidates, and its business development professionals work closely with recruiters to ensure candidate placement and client satisfaction. A significant percentage of the candidates that LaSalle places every year have previously been placed by LaSalle for either a temporary assignment or a long-term role.

42. LaSalle has developed a robust network of clients, talent, and industry insights through extensive and costly research and other measures, as well as employee training initiatives.

43. LaSalle's efforts have culminated in its recognition as a premier, go-to staffing organization for businesses with vacant positions or temporary labor needs, as well as for candidates looking for long-term or temporary opportunities.

44. It is imperative to LaSalle's ongoing financial growth and well-being that its client and candidate information remains confidential, as industry competition for business clients and job candidates is fierce.

## II. *LaSalle's Specialized, Company-Specific Proprietary Training.*

45. LaSalle expends considerable resources to attract, service, and retain talent and to train client-facing representatives, including business development professionals. This includes proprietary training to develop and reinforce each employee's skills and strategies for client development and talent retention.

46. The estimated cost of LaSalle's early-career employee development efforts is in excess of $10,000 per employee, and frequently is much higher.

47. LaSalle continues to emphasize training for its recruitment and business development professionals throughout their employment with LaSalle.

48. LaSalle employees frequently attend proprietary training sessions regarding topics such as LaSalle's client and candidate recruitment strategies and methods of operations. LaSalle develops these training programs in-house at a cost of over $10,000.00 per employee, per year.

49. These trainings inform employees of LaSalle's unique business processes and give employees the tools that allow them to excel at their jobs. In turn, this increases LaSalle's revenue and growth opportunities.

288540190.v5

**III.    LaSalle's Efforts to Protect and Maintain the Secrecy of Its Confidential, Proprietary and Trade Secret Information.**

50.    LaSalle undertakes significant efforts to safeguard and maintain the secrecy of its confidential, proprietary and trade secret information, including information regarding its networks of business clients and job candidates.

51.    At the commencement of employment, LaSalle provides employees with a copy of its Employee Handbook, which includes policies and procedures relative to conflicts of interest, confidentiality, LaSalle's legal ownership of work product, the security of LaSalle-issued electronic devices, the return of company property, and data security.  A true and correct copy of relevant portions of the Employee Handbook are attached hereto as **Exhibit B**.

52.    For example, the Employee Handbook advised employees of the following:

- "Information known to be confidential or privileged acquired in the course of employment at the LaSalle should be used only for LaSalle purposes." [*Id.* at p. 12];

- LaSalle retains sole and exclusive legal ownership of all work product created by employees during their employment, even after such employment ends. [*Id.* at p. 13]; and

- Information classified as confidential remains so even after the end of employment. [*Id.* at p. 13].

53.    It is LaSalle's practice to have employees sign an acknowledgement stating that they have received and will review the Employee Handbook.

54.    LaSalle further endeavors to protect its confidential, proprietary, and trade secret information through requiring employees with access to such information to execute an Employment Agreement imposing obligations on employees related to the non-use and non-disclosure of LaSalle's confidential, proprietary and trade secret information.

55.    As discussed herein, Schaufelberger signed such an Employment Agreement. [*See generally* Ex. A].

10

#### IV. *Schaufelberger's Employment with LaSalle and the Employment Agreement.*

56. Schaufelberger began working for LaSalle as an Account Executive on or about April 5, 2021.

57. In connection with the commencement of his employment, Schaufelberger signed the Employment Agreement, dated March 26, 2021, effective as of April 5, 2021.

58. In signing the Employment Agreement, Schaufelberger acknowledged that LaSalle's business is "providing comprehensive employee staffing services, including but not limited to, employee staffing, employee recruitment, development of hiring plans and general consulting on all issues involving employee administration." Schaufelberger also acknowledged that he would "be in a trusted position whereby [he] [would] have access to confidential information concerning the business of [LaSalle] and confidential information concerning the clients, vendors, accounts, candidates, employees, contacts and prospective clients, vendors, accounts, candidates, employees and contacts of [LaSalle]." [Ex. A at p. 1].

59. The Employment Agreement contains restrictive covenants. In consideration for his execution of the Employment Agreement, including the non-competition, non-solicitation, and confidentiality covenants therein, Schaufelberger was hired by LaSalle and received a signing bonus of $500.00. Schaufelberger further acknowledged that "a portion of his [compensation] represents consideration for the non-competition [and] non-solicitation … provisions." [Ex. A at 3(A)].

60. The non-competition provision in the Employment Agreement barred Schaufelberger, during his employment and for a period of twelve months thereafter, from engaging, directly or indirectly, in any business or providing any products or services the same as, similar to, "or otherwise competitive with the business, products or services that were provided by

11

288540190.v5

Employee while employed at LaSalle Staffing in any geographic territory that LaSalle Staffing is rendering services or selling products." [*See* Ex. A § 7(A) (v)].

61.     The Employment Agreement contains the following covenants relative to the non-solicitation of business clients and job candidates:

- With respect to business clients, Schaufelberger shall not, during his employment with LaSalle and for twelve months thereafter, "[i]nduce or attempt to induce, solicit or attempt to solicit, contract with or accept business from (a) any client or prospective client (defined below) that LaSalle Staffing recruited, solicited or serviced by LaSalle Staffing during Employee's employment, provided Employee had access to confidential information regarding that client during Employee's employment, for the purposes of providing any products or services the same as, similar to, or otherwise competitive with the products or services Employee provided while employed by LaSalle Staffing." [Ex. A § 7(A)(i)].

- With respect to job candidates, Schaufelberger shall not, during his employment with LaSalle and for twelve months thereafter, "[i]nduce or attempt to induce, solicit or attempt to solicit, contract with or accept business from (a) any candidate or prospective candidate (defined below) that LaSalle Staffing recruited, solicited or serviced by LaSalle Staffing during Employee's employment, provided Employee had access to confidential information regarding that candidate during Employee's employment, for the purposes of providing any products or services the same as, similar to, or otherwise competitive with the products or services Employee provided while employed by LaSalle." [Ex. A § 7(A)(ii)].

62.     The Employment Agreement defines "client" to mean "businesses for which LaSalle Staffing provides any of its employee staffing services" and "candidate" to mean "individuals who are evaluated by LaSalle Staffing for either temporary or permanent placement at a client." [Ex. A § 7(D)].

63.     The Employment Agreement similarly barred Schaufelberger, during his employment and for twelve months after the termination of his employment, from advising, inducing, or persuading "any person or business not to do business with LaSalle Staffing or to cancel or fail to renew any contract with LaSalle Staffing."  [Ex. A § 7(A)(iii)].

12

288540190.v5

64.     The non-competition and non-solicitation provisions in Section 7 of the Employment Agreement provide for tolling, whereby the duration of such covenants shall be computed from the date injunctive or other relief is granted. [Ex. A § 7(C)].

65.     With respect to confidentiality covenants, the Employment Agreement contains a "Confidential Information" clause that reads, in pertinent part:

> While this Agreement is in effect and thereafter, [Schaufelberger] shall keep secret and retain in strictest confidence, and shall not, without the prior written consent of LaSalle [], furnish, make available or disclose to any individual or entity or use for the benefit of [Schaufelberger] or any individual or entity, any Confidential Information, except to the extent reasonably necessary to carry out [Schaufelberger's] duties and responsibilities to LaSalle [] or to the extent required by law or to comply with the lawful subpoena of any administrative or governmental body . . . [.]

[*See* Ex. A § 5].

66.     The Employment Agreement defines "Confidential Information" as:

> Any confidential or proprietary information relating to the business or affairs of LaSalle [], including, but not limited to, information relating to financial statements, business plans, forecasts, advertising, purchasing plans, **client identities**, **potential clients**, **individuals**, vendors, equipment, methods, systems, programs, strategies and information, analyses, profit margins or other proprietary information used by LaSalle [] in connection with their business . . . [.]

[*Id.* (emphasis added)].

67.     The Confidential Information provision was intended to maintain LaSalle's "heightened protection obligations" and to "protect trade secret, intellectual property or other proprietary information relating to" LaSalle's confidential business matters.

68.     Schaufelberger expressly acknowledged that LaSalle's Confidential Information was "vital, sensitive, confidential and proprietary to LaSalle . . . [.]" and promised to return any Confidential Information in his possession immediately upon LaSalle's request or the termination of his employment, whichever is earlier. [Ex. A §§ 5, 12].

13

288540190.v5

69.     Schaufelberger also acknowledged that §§ 5 and 7 of the Employment Agreement (which set forth the confidentiality, non-competition, and non-solicitation covenants) were "reasonable and necessary" to protect LaSalle's legitimate business interests and that any violation of the restrictive covenants would result in irreparable injury to LaSalle for which injunctive relief, including a temporary restraining order, would be appropriate.  [*See* Ex. A § 10].

70.     He also "warrant[ed], covenant[ed], and agree[d] that the non-competitive restrictions set forth herein and agreed to by [him], will not preempt or preclude [him] from engaging in … his chosen field of practice nor will such restriction materially effect [*sic*] the income that [he] might otherwise derive from such field of practice." [Ex. A § 7(B)].

71.     In the event Schaufelberger breaches the Employment Agreement and LaSalle successfully obtains a legal and/or equitable remedy, Schaufelberger "shall reimburse LaSalle Staffing for the entire amount of all expenses, reasonable costs, and attorneys' fees incurred by it in seeking such remedy."  [Ex. A § 10].

72.     In or around February 2022, Schaufelberger was promoted to Account Executive II.

73.     Schaufelberger's roles as Account Executive and Account Executive II were client-facing roles, in which he maintained close contact with LaSalle's existing and prospective clients and candidates.

74.     Thereafter, in or around September 2022, Schaufelberger was promoted to Business Development Manager and retained that title until he voluntarily resigned from his employment with LaSalle.

75.     Schaufelberger's responsibilities as a Business Development Manager included generating new business for LaSalle, contacting leads to generate revenue, participating in face-

14

to-face meetings and presentations with current and prospective business clients, developing and maintaining existing client relationships, partnering with recruiters to generate candidate placements, and working with LaSalle's management team regarding business development topics.

76.     As a Business Development Manager, Schaufelberger had regular, direct contact with LaSalle's clients and had access to all client accounts. As a result, Schaufelberger necessarily developed a familiarity with clients' hiring strategies, organizational structures, and talent needs. Information regarding LaSalle's clients is maintained in LaSalle's internal systems and is acquired over a significant period of time, effort, and investment by LaSalle.

77.     At the time of Schaufelberger's hire, LaSalle provided him with the structured onboarding process and training programs described above. These comprehensive training programs led to Schaufelberger's implementation of improved leadership, recruiting, and business development strategies, enhanced his understanding of industry compliance, and provided him with direct access to a network of clients and candidates.

78.     LaSalle's investment in Schaufelberger provided him with the knowledge and skills necessary to receive promotions throughout his career with LaSalle. With each promotion Schaufelberger received, LaSalle invested thousands of dollars getting Schaufelberger acclimated to his new role.

79.     At all times, the Employment Agreement remained in full force and effect.

**V.      *Schaufelberger's Access to LaSalle's Confidential, Proprietary, and Trade Secret Information.***

80.     Schaufelberger was successful in his roles with LaSalle.

81. For example, on behalf of LaSalle, Schaufelberger helped to grow, develop and maintain LaSalle's network of clients and successfully worked with his LaSalle colleagues to place candidates with those clients.

82. During his employment with LaSalle, Schaufelberger placed hundreds of individuals across multiple client engagements with increasing fill ratios.

83. To perform his job functions, Schaufelberger had access to LaSalle's confidential, proprietary, and trade secret information, including the identities of and information concerning LaSalle's actual and prospective clients, actual and prospective candidates, client contacts, decision-makers, hiring needs, placement opportunities, staffing histories, pricing and service information, and relationship information.

84. Schaufelberger had access to LaSalle's internal systems used to maintain information relating to clients, prospective clients, candidates, prospective candidates, contacts, outreach, hiring needs, placement history, client preferences, and other confidential and proprietary business information.

85. For instance, Schaufelberger had unrestricted access to LaSalle's customer relations management system, Bullhorn, at a cost to LaSalle of $350.00 per month ($4,200.00 per year) for Schaufelberger's account alone. LaSalle also paid for Schaufelberger to have access to a LinkedIn Recruiter account. Linked-In Recruiter permits recruiters to search for potential job candidates, communicate with them directly, and develop recruiting pipelines that support client hiring needs. LinkedIn Recruiter costs approximately $4,080.00 per user annually and is important to LaSalle's recruiting infrastructure.

288540190.v5

86.     These systems contain proprietary information developed by LaSalle over more than 26 years, including information related to LaSalle's clients, candidate pipelines, and detailed notes pertaining to clients' hiring needs and placement history.

87.     Because these systems contain sensitive, confidential and proprietary information, access is limited to LaSalle employees that have client-facing roles whose responsibilities require client interaction and review of client data. Access to each system is controlled through individual login credentials, and the systems maintain activity records that reflect employee interactions with clients and job candidates. System access and activity is overseen by LaSalle's Information Technology Department.

88.     LaSalle estimates that, as a Business Development Manager, Schaufelberger interacted directly with at least 10-20 of LaSalle's clients on a weekly basis.

89.     Schaufelberger's direct client-facing role gave him access to LaSalle's confidential client relationship information and to client goodwill developed at LaSalle's expense.

90.     As a Business Development Manager who interfaced with LaSalle's clients and prospective clients, Schaufelberger was highly influential in assisting existing and prospective clients in deciding whether they would do or continue to do business with LaSalle.

91.     Schaufelberger obtained and developed his relationship with LaSalle's business clients and client contacts through his employment with LaSalle and through LaSalle's investment in training, resources, client-development strategy, and confidential information.

## VI.     *Schaufelberger Accepts Employment with Beacon Hill, LaSalle's Direct Competitor.*

92.     On or about September 8, 2025, Schaufelberger voluntarily resigned from his employment with LaSalle.

93.     At the time of his departure, Schaufelberger had been an employee of LaSalle for more than four years.

288540190.v5

94. LaSalle verbally reminded Schaufelberger of his post-termination obligations to LaSalle under the Employment Agreement upon receiving his resignation.

95. LaSalle thereafter reminded Schaufelberger of his post-termination obligations in writing on September 15, 2025.

96. LaSalle later learned that the job Schaufelberger had accepted at Beacon Hill was that of Senior Account Executive representing its staffing division, performing functionally the same role he performed at LaSalle.

97. Beacon Hill competes directly with LaSalle in providing staffing and workforce solutions to businesses in the Chicago, Illinois area.

98. As part of his work with Beacon Hill, Schaufelberger builds relationships with client businesses seeking administrative and professional talent and represents Beacon Hill's staffing division in providing staffing solutions.

99. In his role with Beacon Hill, Schaufelberger performs essentially the same work he performed while employed by LaSalle, including developing client relationships and providing staffing solutions in a competitive staffing business.

100. Schaufelberger's work for Beacon Hill is the same as, similar to, or otherwise competitive with the services he performed while employed by LaSalle.

101. By employing Schaufelberger in essentially the same role that Schaufelberger performed for LaSalle, Beacon Hill is receiving the benefit of the significant investment that LaSalle made in Schaufelberger's skills and qualifications in the staffing industry, including training, promotions, development opportunities, client access, and goodwill, all developed at LaSalle's expense.

18

288540190.v5

102. Upon information and belief, Beacon Hill knew or should have known of Schaufelberger's restrictive covenants with LaSalle, including because Beacon Hill is a sophisticated staffing competitor that hired Schaufelberger from LaSalle into a substantially similar client-facing staffing role and because such covenants are common and material in the staffing industry.

103. Upon information and belief, Beacon Hill has knowingly aided, encouraged, and facilitated Schaufelberger's breach of the Employment Agreement by employing Schaufelberger in a role that requires him to perform the same or similar services for a direct competitor and by allowing or encouraging Schaufelberger to contact, solicit, service, or accept business from LaSalle clients and contacts.

## VII. *LaSalle Discovers Schaufelberger's Communications with a LaSalle Client.*

104. Schaufelberger provided staffing services in the Chicago, Illinois region as an employee of LaSalle and continues to perform services in the Chicago region as an employee of Beacon Hill.

105. On or about June 17, 2026, LaSalle discovered that Schaufelberger was working for Beacon Hill and was actively communicating with an active, longstanding business client for whom LaSalle provided staffing services.

106. LaSalle discovered Schaufelberger's communications with this business client when the client emailed Schaufelberger's old LaSalle work email address and included an email chain reflecting Schaufelberger's communications with the client in his new role with Beacon Hill. A true and correct, redacted copy of the relevant email chain as attached hereto as **Exhibit C**.

107. The email chain revealed, among other things, that Schaufelberger has been meeting with a Senior Talent Acquisition Partner of LaSalle's business client every month.

19

108. In that same email chain, another employee of Beacon Hill references Schaufelberger and attempts to solicit business from the same client of LaSalle.

109. The business client at issue is a LaSalle client, and Schaufelberger contacted and had access to confidential information regarding that client during his employment with LaSalle.

110. Schaufelberger acquired his relationship with the business client and the Senior Talent Acquisition Partner exclusively through his employment with LaSalle and through LaSalle's training, resources, confidential information, and client-development support.

111. Schaufelberger's communications with this LaSalle client and client contact concern the same or similar services that Schaufelberger provided while employed by LaSalle and the same or similar services that Beacon Hill provides in competition with LaSalle.

112. Schaufelberger has solicited or attempted to solicit, contracted with or attempted to contract with, accepted business from or attempted to accept business from, and/or induced or attempted to induce this LaSalle client to do business with Beacon Hill in violation of the Employment Agreement.

113. Schaufelberger has used or threatened to use LaSalle's confidential, proprietary, and trade secret information, including LaSalle's client contact information, relationship information, staffing needs, and goodwill, to compete with LaSalle, divert business from LaSalle to Beacon Hill, and interfere with LaSalle's relationships with its clients and contacts.

114. Beacon Hill has benefited from and continues to benefit from Schaufelberger's breach of the Employment Agreement and Schaufelberger's use or threatened use of LaSalle's confidential, proprietary, and trade secret information and goodwill.

115. LaSalle does not yet know the full scope of Schaufelberger's communications with LaSalle clients, prospective clients, candidates, prospective candidates, or contacts while

20

employed by Beacon Hill, nor does LaSalle yet know the full extent to which Schaufelberger has retained, transferred, disclosed, or used LaSalle information in connection with his work for Beacon Hill.

116. Expedited discovery is necessary to determine, among other things, the LaSalle clients, prospective clients, candidates, prospective candidates, and contacts with whom Schaufelberger or Beacon Hill has communicated; the scope of any business solicited, pursued, accepted, or serviced by Schaufelberger or Beacon Hill in violation of the Employment Agreement; and whether Schaufelberger retained, transferred, disclosed, or used LaSalle's documents, data, or confidential information after his resignation.

## VIII. *Defendants' Conduct Has Caused and Will Continue to Cause Irreparable Harm.*

117. Defendants' conduct has caused LaSalle to suffer both monetary damages and irreparable harm that cannot be fully compensated by monetary damages.

118. LaSalle's client relationships, client goodwill, confidential information, and competitive position are critical to its business and are not readily quantifiable in monetary terms.

119. If Defendants are not immediately restrained, Schaufelberger and Beacon Hill will continue to use LaSalle's goodwill, client relationships, and confidential information to compete against LaSalle and divert business from LaSalle to Beacon Hill.

120. LaSalle faces an imminent and irreparable threat to its business operations unless Defendants are immediately ordered to: (i) stop using or disclosing LaSalle's confidential, proprietary, and trade secret information; (ii) stop soliciting, contacting, contracting with, or accepting business from LaSalle clients, prospective clients, candidates, prospective candidates, and contacts in violation of the Employment Agreement; (iii) stop interfering or attempting to interfere with LaSalle's business relationships; (iv) preserve and return LaSalle's documents, files, data, and property; and (v) participate in expedited discovery sufficient to assess the full scope of

21

Defendants' conduct and determine whether Schaufelberger retained, transferred, disclosed, or used LaSalle information after his resignation.

121. LaSalle's right to such relief is clear, LaSalle has a reasonable likelihood of success on the merits, LaSalle will suffer greater irreparable harm if an injunction is wrongfully denied than Defendants will endure if an injunction is wrongfully granted, and granting injunctive relief would advance the public interest in enforcing valid contracts, protecting confidential information and trade secrets, and preventing unfair competition.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT OF 2016
### 18 U.S.C. §§ 1836, *et seq*.
### (All Defendants)

122. LaSalle incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

123. LaSalle owns and possesses trade secrets as described above, including but not limited to information concerning actual and prospective business clients and job candidates, client contacts and decision-makers, client hiring needs, pricing and service information, placement history, client preferences, relationship information, business development strategies, staffing strategies, marketing strategies and business strategies. These trade secrets are critical to LaSalle's business and success as a staffing company.

124. LaSalle derives independent economic value from the fact that such trade secrets are not generally known to the public and are not readily ascertainable through proper means by competitors or other persons who could obtain economic value from the use or disclosure of such information.

125.    LaSalle has taken, and continues to take, reasonable and affirmative measures to keep its trade secret information secret and confidential.

126.    LaSalle has invested substantial time and money in developing its trade secrets.

127.    Without LaSalle's consent, Schaufelberger has used and threatens to use LaSalle's trade secrets – including LaSalle's confidential client information – for the benefit of himself and Beacon Hill, including by communicating with, soliciting, attempting to solicit, servicing, or accepting business from a LaSalle client contact whose relationship Schaufelberger acquired through LaSalle and whose information Schaufelberger accessed during his employment with LaSalle.

128.    Beacon Hill has used and threatens to use LaSalle's trade secrets through Schaufelberger and has benefited from Schaufelberger's use or threatened use of LaSalle's trade secrets and goodwill.

129.    As such, Defendants have committed one or more acts of actual or threatened misappropriation of trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*

130.    LaSalle does not seek to prevent Schaufelberger from earning a livelihood based merely on general knowledge or skills. LaSalle seeks tailored relief preventing Defendants from using or disclosing LaSalle's trade secrets, soliciting or accepting business from LaSalle clients and contacts in violation of Schaufelberger's restrictive covenants, and otherwise misappropriating LaSalle's confidential and trade secret information.

131.    As a direct result of Defendants' conduct, LaSalle has suffered both monetary losses and irreparable harm for which there is no adequate remedy at law.

132. Defendants' actual and threatened misappropriation is ongoing, and LaSalle continues to suffer monetary losses and irreparable harm, including but not limited to lost goodwill, reputational harm, loss of clients and candidates, loss of competitive position, and loss of confidentiality of confidential, proprietary, and trade secret information.

133. Such irreparable harm and the resulting injury to LaSalle will not cease unless Defendants' conduct is enjoined.

134. LaSalle's right to such relief is clear, and LaSalle has a reasonable likelihood of success on the merits.

135. LaSalle will suffer greater irreparable harm if an injunction is wrongfully denied than Defendants will endure if an injunction is wrongfully granted.

136. Granting injunctive relief would advance the public interest in protecting employers' trade secrets and confidential information.

137. In light of Defendants' conduct, LaSalle is entitled to injunctive relief based on actual and threatened misappropriation as set forth in 18 U.S.C. § 1836(b)(3)(A)(i).

138. Defendants' misappropriation and threatened misappropriation of LaSalle's trade secrets entitle LaSalle to monetary damages, as provided in 18 U.S.C. § 1836(b)(3)(B). LaSalle is also entitled to recover for Defendants' unjust enrichment.

139. Defendants' conduct was willful and malicious and was undertaken for the purpose of benefiting Defendants at LaSalle's expense. LaSalle therefore seeks exemplary damages and attorneys' fees as set forth in 18 U.S.C. § 1836(b)(3)(C)-(D).

24

## COUNT II
## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
### 765 ILCS 1065, *et seq*.
### (All Defendants)

140. LaSalle incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

141. LaSalle owns and possesses trade secrets as described above, including but not limited to information concerning actual and prospective business clients and job candidates, client contacts and decision-makers, client hiring needs, pricing and service information, placement history, client preferences, relationship information, business development strategies, staffing strategies, marketing strategies, and business strategies.

142. These trade secrets are critical to LaSalle's business and success as a staffing company.

143. LaSalle derives independent economic value from the fact that such trade secrets are not generally known to competing staffing firms or other persons who could obtain economic value from the use or disclosure of such information.

144. LaSalle has taken, and continues to take, reasonable and affirmative measures to keep its trade secret information secret and confidential.

145. LaSalle has invested substantial time and money in developing its trade secrets.

146. Schaufelberger acquired LaSalle's trade secrets during his employment with LaSalle under circumstances giving rise to a duty to maintain their secrecy and limit their use to LaSalle business purposes.

147. Without LaSalle's consent, Schaufelberger has used and threatens to use LaSalle's trade secrets—including LaSalle's confidential client information—for the benefit of himself and Beacon Hill, including by communicating with, soliciting, attempting to solicit, servicing, or

25

accepting business from a LaSalle client and client contact whose relationship Schaufelberger acquired through LaSalle and whose information Schaufelberger accessed during his employment with LaSalle.

148. Beacon Hill has used and threatens to use LaSalle's trade secrets through Schaufelberger and has benefited from Schaufelberger's use or threatened use of Lasalle's trade secrets and LaSalle goodwill.

149. Defendants have committed one or more acts of actual or threatened misappropriation of trade secrets within the meaning of the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*

150. As a direct result of Defendants' conduct, LaSalle has suffered both monetary losses and irreparable harm, including without limitation lost goodwill, lost profits, loss of confidentiality of LaSalle's confidential business information and trade secrets, harm to reputation, and lost business clients and job candidates.

151. Defendants' actual and threatened misappropriation is ongoing, and LaSalle continues to suffer monetary losses and irreparable harm for which there is no adequate remedy at law.

152. Such irreparable harm and the resulting injury to LaSalle will not cease unless Defendants' conduct is enjoined.

153. LaSalle's right to such relief is clear, and LaSalle has a reasonable likelihood of success on the merits.

154. LaSalle will suffer greater irreparable harm if an injunction is wrongfully denied than Defendants will endure if an injunction is wrongfully granted.

26

288540190.v5

155. Granting injunctive relief would advance the public interest in protecting employers' trade secrets and confidential information.

156. In light of Defendants' conduct, LaSalle is entitled to injunctive relief based on actual and threatened misappropriation as set forth in 765 ILCS 1065/3.

157. Defendants' misappropriation and threatened misappropriation of LaSalle's trade secrets entitle LaSalle to monetary damages as provided in 765 ILCS 1065/4(a). LaSalle is also entitled to recover for Defendants' unjust enrichment.

158. Defendants' conduct was willful and malicious and was undertaken for the purpose of benefiting Defendants at LaSalle's expense. LaSalle therefore seeks exemplary damages and attorneys' fees as set forth in 765 ILCS 1065/4(b) and 765 ILCS 1065/5.

**COUNT III**
**BREACH OF CONTRACT – EMPLOYMENT AGREEMENT**
**(Schaufelberger)**

159. LaSalle incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

160. The Employment Agreement is a valid and enforceable contract that is supported by adequate consideration.

161. Schaufelberger expressly agreed to the terms of the Employment Agreement as a condition of his employment with LaSalle and accepted all the consideration provided to him in exchange for his execution of the Agreement, including continuous at-will employment through September 8, 2025, and a sign-on bonus of $500.00.

162. At all times material and relevant hereto, LaSalle has fully performed and complied with its duties and obligations under the Employment Agreement.

163. All conditions precedent to LaSalle's right to Schaufelberger's full performance under the Employment Agreement have been satisfied, waived, or excused.

27

288540190.v5

164.    Schaufelberger has breached and continues to breach the Employment Agreement by:

a.    Engaging directly or indirectly in a business and/or providing products or services the same as, similar to, or otherwise competitive with the business, products, or services that Schaufelberger provided while employed by LaSalle, in geographic territories in which LaSalle renders services or sells products, including through his employment with Beacon Hill as a Senior Account Executive [Ex. A § 7(A)(v)];

b.    Inducing or attempting to induce, soliciting or attempting to solicit, contracting with or attempting to contract with, and/or accepting or attempting to accept business from LaSalle clients or prospective clients that LaSalle recruited, solicited, or serviced during Schaufelberger's employment, and which Schaufelberger contacted and had access to confidential information regarding during his employment, for the purpose of providing products or services the same as, similar to, or otherwise competitive with the products or services Schaufelberger provided while employed by LaSalle [Ex. A §§ 7(A)(i), (ii), (iii)]; and

c.    Interfering or attempting to interfere with LaSalle's relationship with a LaSalle client and client contact whose relationship with Schaufelberger was developed through his employment with LaSalle; and

d.    Using and/or threatening to use LaSalle's confidential information, client relationship information, and goodwill for the benefit of himself and Beacon Hill and to LaSalle's detriment.

165.    LaSalle is entitled to an award of attorneys' fees, costs and expenses based upon Schaufelberger's breaches of the Employment Agreement. [Ex. A § 10].

166.    Schaufelberger acknowledged that §§ 5 and 7 of the Employment Agreement (which set forth the Employment Agreement's confidentiality, non-competition, and non-solicitation covenants) were "reasonable and necessary" to protect LaSalle's legitimate business interests and that any violation of the restrictive covenants would result in irreparable injury to LaSalle for which injunctive relief, including a temporary restraining order, would be appropriate. [*See* Ex. A § 10].

28

288540190.v5

167. Schaufelberger's breaches of the Employment Agreement are ongoing and continue to harm LaSalle.

168. Schaufelberger's breaches of the Employment Agreement have caused and will continue to cause LaSalle to suffer irreparable harm for which there is no adequate remedy at law, including but not limited to lost goodwill, reputational harm, loss of clients and candidates, and loss of confidentiality of confidential, proprietary and trade secret information.

169. Such irreparable harm, and the resulting injury to LaSalle, will not cease unless Defendants' misappropriation is enjoined.

170. LaSalle's right to such relief is clear, and LaSalle has a reasonable likelihood of success on the merits.

171. LaSalle will suffer greater irreparable harm if an injunction is wrongfully denied than Schaufelberger will endure if an injunction is wrongfully granted.

172. Granting injunctive relief would advance the public interest in enforcing valid contracts and protecting employers' confidential, proprietary, and trade secret information.

173. As a direct and proximate result of Schaufelberger's material breaches of the Employment Agreement, LaSalle has, and will continue, to incur damages, including but not limited to: (a) lost clients, candidates and profits, (b) harm to goodwill, (c) harm to business reputation; (d) loss of competitive position; (e) loss of confidentiality of LaSalle's confidential, proprietary and trade secret information; and (f) other items of compensatory and consequential damages.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
## OR CONTRACTUAL RELATIONS
### (Beacon Hill)

174.    LaSalle incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

175.    The Employment Agreement between Schaufelberger and LaSalle is a valid and enforceable contract that is supported by adequate consideration.

176.    Upon information and belief, Beacon Hill was aware of the Employment Agreement and the contractual relationship between Schaufelberger and LaSalle and was further aware of the restrictive covenants in the Employment Agreement.

177.    Beacon Hill is a sophisticated staffing competitor that hired Schaufelberger from LaSalle into a substantially similar client-facing staffing role and knew or should have known that Schaufelberger was subject to restrictive covenants protecting LaSalle's clients, candidates, confidential information, and goodwill.

178.    Beacon Hill has intentionally and without justification induced, facilitated, and encouraged Schaufelberger to breach the Employment Agreement and continues to do so.

179.    As alleged herein, Schaufelberger has breached and continues to breach the Employment Agreement.

180.    Beacon Hill unjustifiably and intentionally caused Schaufelberger to breach the Employment Agreement by employing Schaufelberger in a substantially similar role for a direct competitor and by encouraging, facilitating, permitting, or accepting the benefits of Schaufelberger's solicitation, contact, servicing, or acceptance of business from LaSalle clients and contacts in violation of Schaufelberger's Employment Agreement.

288540190.v5

181. As a result of Beacon Hill's unjustifiable inducement of Schaufelberger's breach of the Employment Agreement and related conduct, LaSalle has suffered and will continue to suffer damages, including but not limited to: (a) lost business clients, job candidates, and profits; (b) harm to goodwill; (c) harm to business reputation; (d) loss of competitive position; (e) loss of confidentiality of LaSalle's confidential, proprietary, and trade secret information; and (f) other compensatory and consequential damages.

182. Beacon Hill acted intentionally, willfully, maliciously, and with wanton disregard of LaSalle's rights in the course of interfering with Schaufelberger's performance of the Employment Agreement and inducing breaches thereof.

183. Beacon Hill's tortious interference was willful and malicious, warranting an award of punitive damages.

**COUNT V**
**CIVIL CONSPIRACY**
**(All Defendants)**

184. LaSalle incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

185. Defendants' conduct constitutes an unlawful civil conspiracy to harm LaSalle's business, goodwill, and competitive position by misappropriating or threatening to misappropriate LaSalle's confidential, proprietary, and trade secret information, interfering with LaSalle's contractual rights, interfering with LaSalle's client relationships, and diverting business from LaSalle to Beacon Hill.

186. Defendants conspired, agreed, and engaged in a combination among them, acting with concerted action and a common purpose, to commit the unlawful acts alleged herein through the unlawful means and for the unlawful purposes alleged herein.

31

288540190.v5

187. One or more of the Defendants engaged in overt tortious or unlawful acts alleged herein in furtherance of Defendants' common and unlawful purpose.

188. As a direct and proximate result of Defendants' conduct, LaSalle has sustained damages including, but not limited to: (a) lost clients, candidates, and profits; (b) harm to goodwill; (c) harm to business reputation; (d) loss of competitive position; (e) loss of confidentiality of LaSalle's confidential, proprietary, and trade secret information; and (f) other compensatory and consequential damages.

189. Defendants acted intentionally, willfully, maliciously, and with wanton disregard of LaSalle's rights.

190. Defendants' conduct, as alleged herein, was willful and malicious, warranting an award of punitive damages.

## RELIEF REQUESTED

WHEREFORE, LaSalle respectfully requests the following relief:

a) Immediate and preliminary injunctive relief, including a temporary restraining order: (i) enjoining Defendants from misappropriating, using, or disclosing LaSalle's confidential, proprietary, or trade secret information; (ii) ordering Defendants to return and/or delete (as appropriate) all of LaSalle's documents, files, data, and other property in their possession, custody, or control, whether in electronic form, hard copy, or any other medium; (iii) enjoining Schaufelberger for twelve (12) months from the date of an applicable Order, directly or indirectly, through Beacon Hill or any other person or entity, from inducing or attempting to induce, soliciting or attempting to solicit, contracting with or attempting to contract with, or accepting or attempting to accept business from any actual or prospective business clients or job candidates of LaSalle that LaSalle recruited, solicited, or serviced during Schaufelberger's employment and regarding which

32

Schaufelberger had access to confidential, proprietary or trade secret information during his employment with LaSalle; (iv) enjoining Schaufelberger from interfering or attempting to interfere with the relationship between LaSalle and any of its business clients or job candidates about which Schaufelberger had access to confidential information for twelve (12) months from the date of an applicable Order; and (v) enjoining Schaufelberger from providing temporary staffing or direct hire recruitment services to business clients or job candidates in the same capacity in which he performed such services for LaSalle for twelve (12) months from the date of an applicable Order.

b)      An order requiring Defendants to preserve all documents, data, communications, devices, accounts, electronically stored information, and other evidence relating to Schaufelberger's employment with LaSalle, Schaufelberger's employment with Beacon Hill, Schaufelberger's communications with LaSalle clients, prospective clients, candidates, prospective candidates, and contacts, and any LaSalle information in Defendants' possession, custody, or control;

c)      An order requiring Defendants to provide expedited discovery sufficient to determine the nature, extent, and breadth of Schaufelberger's breaches and other unlawful conduct committed by Defendants and any other person acting in concert with them or on their behalf;

d)      A judgment against Defendants for actual, exemplary, and punitive damages in an amount to be determined at the time of trial, in excess of $75,000.00;

e)      Pre-judgment and post-judgment interest and costs;

f)      A permanent injunction against Defendants to the same or greater effect as the temporary restraining order and/or preliminary injunction sought herein;

g)      An award of LaSalle's attorneys' fees and expenses; and

h)      Such other relief as the Court and/or trier of fact deems just and proper.

288540190.v5

## JURY DEMAND

Plaintiff LaSalle hereby demands a trial by jury on all issues so triable.

Dated: July 6, 2026

Respectfully submitted,

*/s/ Paul E. Starkman*
Paul E. Starkman, Esq.
pstarkman@clarkhill.com

Jennifer Richnafsky, Esq.
jrichnafsky@clarkhill.com
*(Pro Hac Vice Admission Pending)*

Shelby Garland, Esq.
sgarland@clarkhill.com
*(Pro Hac Vice Admission Pending)*

**CLARK HILL PLC**
130 E. Randolph St.
Suite 3900
Chicago, IL 60601
Phone: (312) 985-5900

*Counsel for Plaintiff, LaSalle Staffing, LLC*

34

288540190.v5

## **VERIFICATION**

I, Sarah Lafontaine, pursuant to 28 U.S.C. § 1746, declare as follows:

I, Sarah Lafontaine, Senior Director of Plaintiff LaSalle Staffing, LLC, state that I have read and made this Verified Complaint and attest that those facts stated of my own knowledge are true to the best of my knowledge, information and belief and those matters stated of which I have been informed I believe to be true after reasonable inquiry, to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2026 in Cook County, Illinois.


*Sarah Lafontaine*
_____
Sarah Lafontaine